UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO.:

STESIE EDOUARD, an
Individual,

    Plaintiff,

v.

CONVEY HEALTH SOLUTIONS, INC. f/k/a
NATIONSHEALTH, INC., a Delaware Corporation,

    Defendant.
_____/

# COMPLAINT

Plaintiff, Stesie Edouard ("Plaintiff"), sues Defendant, Convey Health Solutions, Inc. f/k/a NationsHealth, Inc. ("Defendant"), and alleges as follows:

## NATURE OF ACTION

1.    Plaintiff brings this lawsuit against her former employer, Defendant, for engaging in discriminatory and retaliatory conduct in violation of the American with Disabilities Act, 42. U.S.C. § 12101, *et. seq*. ("ADA") and the Florida Civil Rights Act of 1997 ("FCRA"), Florida Statutes 760.01, *et. seq*. Plaintiff was employed as a customer service agent with Defendant. Defendant became aware of the fact that Plaintiff suffers from multiple medical conditions, namely, Coagulation Disorder. These medical conditions prevented Plaintiff from working the extended and night shifts. The medical conditions were the consequence of open-heart surgery whereby her aortic valve was replaced with an artificial valve. Plaintiff presented her supervisor and Defendant's human resources department with written instructions that she could not work either the extended shift or late shift. This was because such a change would cause disruption to

Plaintiff's treatment plan, including medication and rest routines, which in turn poses risk to Plaintiff's physical and emotional well-being. Instead of permitting Plaintiff to continue to work the regular shift (as other employees were permitted to do), Defendant attempted to force Plaintiff to work the extended and night shifts, all the meanwhile her supervisor would verbally taunt her to quit. Defendant ultimately terminated Plaintiff for not working the extended or night shifts. Plaintiff seeks damages, both compensatory and punitive, for the violations alleged herein.

## **PARTIES, JURISDICTION & VENUE**

2. Plaintiff, is *sui juris* and a resident of Broward County, Florida and the Southern District of Florida for the United States District Court.

3. Defendant, is a foreign corporation, incorporated in the state of Delaware, and at all material times relevant to this action, has been authorized to do business in the State of Florida. Defendant's principal place of business is located at 100 SE 3rd Ave, 14th Floor, Fort Lauderdale, Florida.

4. This Court has original jurisdiction over this claim pursuant to 28 U.S.C. § 1331 in that the action asserted herein arises under the laws of the United States.

5. Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. § 1391 because- (i) the Defendant resides within said judicial district; and, (ii) a substantial part of the events and omissions giving rise to the claims asserted herein occurred exclusively within said judicial district.

6. All conditions precedent to the bringing and maintenance of this action have either occurred, been excused, or otherwise waived by Defendant.

7. Plaintiff has retained the undersigned law firm in connection with this case and is obligated to pay said firm a fee.

## GENERAL ALLEGATIONS

**A.     Plaintiff's Serious Health Conditions and Disabilities.**

8.     At all times material hereto, Plaintiff has and continues to suffer from multiple, serious and chronic medical conditions.  Any one of these conditions by itself substantially impairs Plaintiff's major life activities, including the impairment of major bodily functions.   Any one of these conditions constitutes a "disability" within the meaning of the ADA.

9.     In or about February, 1994, Plaintiff underwent open heart surgery to repair a heart murmur.  Within days after this procedure, Plaintiff's aortic valve collapsed, thereby necessitating a second open heart surgical procedure to replace her aortic valve with an artificial aortic valve, *to-wit*, a "St. Jude Mechanical Valve."

10.     In or around June, 2013, Plaintiff was diagnosed with Valvular Heart Disease Onset.  "Valvular Heart Disease" ("VHD") encompasses a number of common cardiovascular conditions that account for 10% to 20% of all cardiac surgical procedures in the United States. Plaintiff's VHD constitutes a "disability" within the meaning of the ADA.

11.     In order to protect the continuous and proper functioning of Plaintiff's artificial aortic valve, Plaintiff was placed on Warfarin therapy for the remainder of her life.  Warfarin is an anticoagulant drug (blood thinner) that is used to treat or prevent blood clots in veins or arteries. The goal of Warfarin therapy is to decrease the clotting tendency of blood, not to prevent clotting completely.  Patients on Warfarin therapy must be monitored carefully with blood testing and, based upon test results, the patient's daily dose of Warfarin is adjusted to keep clotting time within a target range.  The blood test used to measure the time it takes for blood to clot is referred to as a prothrombine time test or protime ("PT").  The PT is reported as the International Normalized

Ratio ("INR").[1]  INR must be monitored at least once a month and sometimes as often as twice weekly to make sure that the level of Warfarin remains in the effective range.  If the INR is too low, blood clots will not be prevented, but if the INR is too high, there is an increased risk of bleeding.  Dosage of Warfarin is adjusted according to the INR blood test results. "Labile INRs" refers to unstable/ high INRs or poor time in therapeutic range (e.g., 60%).

12. At all times material hereto, Plaintiff suffered and continues to suffer from labile INRs.

13. As a result of the Warfarin therapy, Plaintiff suffers from the chronic and serious medical condition known as a Coagulation Disorder.  Coagulation Disorders are disruptions in the body's ability to control blood clotting.  Coagulation Disorders can result in either a hemorrhage (too little clotting that causes an increased risk of bleeding) or thrombosis (too much clotting that causes blood clots to obstruct blood flow).  Plaintiff suffers from the Coagulation Disorder type where she is susceptible to hemorrhaging (too little clotting).  Plaintiff's Coagulation disorder constitutes a "disability" within the meaning of the ADA.

14. At all times material hereto, Plaintiff is and was under the care of both a treating cardiologist physician and a primary care physician.  As part of her medical treatment plan, Plaintiff would undergo PT/INR check procedures in order to monitor for labile INRs as part of her routine prosthetic valve anti-coagulation control plan.  Further, Plaintiff's care plan established by her physicians and supported by her immediate family (as Plaintiff lived with her parents) was centered around her working the regular shift (i.e., 8:00 a.m. - 4:30 p.m.).  This care plan includes

---

[1] The INR is a standardized way of expressing the PT value, ensuring that PT results obtained by different laboratories can be compared.

minimizing stress, sufficient rest, and a routine planning of eating, timing of taking medicine, and sleeping.

15. In addition to her other medical conditions, Plaintiff developed and suffers from the secondary medical condition of chronic anemia. Chronic anemia is anemia associated with other long-term health conditions that affects the body's ability to make red blood cells. In Plaintiff's case, the anemia is caused by her Warfarin therapy. Plaintiff routinely suffers from the following anemic symptoms in various gradations from mild to severe that can and do fluctuate: fatigue, weakness, pale skin, cold/ shivers and fast heartbeat. Plaintiff's chronic anemia constitutes a "disability" within the meaning of the ADA.

16. Due to her medical conditions, as treated, Plaintiff is susceptible to and suffers from syncopal episodes likely related to orthostasis. A syncopal episode is where a person suddenly faints or passes out, losing consciousness. Syncopal episodes are typically triggered by a sudden, temporary drop in blood flow to the brain, which leads to loss of consciousness and muscle control. Plaintiff's risk of syncopal episodes possesses a significant threat to her life given, if she faints and cuts or internally bruises herself (as a result of falling), she can hemorrhage to death due to her Coagulation Disorder. Plaintiff's syncopal episodes constitute a "disability" within the meaning of the ADA.

**B.    Plaintiff's Employment with Defendant.**

17. Defendant is a specialized healthcare technology and services company that purportedly provides its clients with healthcare-specific, compliant member support solutions utilizing technology, engagement, and analytics. Specifically, Defendant offers insurance services to providers of Medicare Part B insurance plans and Medicare Part D prescription drug plans.

Those services include marketing, insurance agent training and licensing, member enrollment and service, fulfillment, billing and collections.

18. In or about May, 2016, Defendant hired Plaintiff as its employee. At all times material hereto, Defendant hired Plaintiff for, and Plaintiff occupied, the position of "Member Services Advocate" in the Customer Service Department.

**C. Plaintiff's Medical Condition Worsens, Defendant's Demand that Plaintiff Work the Night Shift, and Defendant's Discrimination.**

19. Prior to an episodic acute onset of syncope and other symptoms caused by her medical conditions, as treated, Plaintiff was recognized as a model employee. She was regularly asked- and happily agreed- to work overtime.

20. On or about June 2, 2017, Plaintiff received from Defendant formal recognition of her stellar work performance by bestowing on Plaintiff the employee recognition award of "Gold Star Performer" for the month of April, 2017.

21. In or about July, 2017, Plaintiff's physical condition worsened due to her medical conditions stated above. She experienced an increase in number and intensity of symptoms.

22. On or about July, 2017, Plaintiff suffered from a syncopal episode at work, losing consciousness. She was transported for treatment to Memorial Hospital. Several months later, Plaintiff suffered from a second syncopal episode at work. A co-worker informed management, who in turn called Plaintiff's parents who picked her up from work, taking her home to rest.

**(Defendant's Demand that Plaintiff Work the Night Shift)**

23. At a time unknown to Plaintiff, Defendant decided to commence transitioning the Member Services Advocates to three (3) different shifts: (1) the first shift (i.e., 9:00 a.m. to 5:30 p.m.); (2) the extended shift (i.e., 11:00 a.m. to 7:30 p.m.); or, (3) the night shift (i.e., 2:00 p.m. to 11:30 p.m.).

24. In or about January, 2018, Defendant, through Ms. Marcellus, informed Plaintiff's entire department, including Plaintiff's supervisor, Ms. Perkins-Hayes, that the entire department may be required to transition to working either the night shifts or extended shifts, with new hires taking the regular shift. Plaintiff informed both her supervisor and the Human Resources Department that she was unable to work either the night shift or the extended shift due to her medical conditions. As further alleged below, although Defendant stated it was transitioning the entire department to either extended or night shifts, ultimately this did not happen, as Defendant permitted several of Plaintiff's peers to remain on the first shift. As further alleged below, none of these other departmental peers suffered from serious medical conditions or disabilities.

25. Plaintiff was unable to work either the extended or night shifts without violating her doctor's medical instructions and care plan. The proposed change posed a danger to her health, as Plaintiff's body likely would react negatively to the disruption to her sleep, rest, eating and medication cycles. Such a change posed a significant risk to Plaintiff's well-being in that it would cause or exacerbate her medical conditions, including, but not limited to, anemia, labile INRs, syncopal episodes, fatigue, lack of mental clarity, and overall depletion and depression of her mood and psychological well-being.

26. On or about March 4, 2018, Defendant reassigned Plaintiff to the night shift.

27. On or about March 5, 2018, Plaintiff consulted with her treating physician who provided specific medical instructions against working either the night shift or extended shift. Plaintiff's treating physician reduced her instructions to a "doctor's note" for Plaintiff to present to Defendant. In accordance with the interactive process requirements of the ADA, Plaintiff promptly presented Defendant with a copy of her treating physician's written instructions, a copy of which is attached hereto as Exhibit A ("Physician's Written Instructions").

28.     On March 6, 2018, Plaintiff returned to work whereby she promptly provided her supervisor a copy of her Physician's Written Instructions.  Plaintiff learned, after inquiring of the Human Resources Department, that her supervisor never provided or otherwise communicated to Human Resources, either the fact that Plaintiff obtained the Physician's Written Instructions or the contents thereof.  Consequently, Plaintiff was required, and in fact did, return to her physician to obtain a copy of the Physician's Written Instructions.  Plaintiff's physician's office faxed a copy of the Physician's Written Instructions directly to Defendant's HR Department.  Two days later, on March 8, 2018, Defendant reassigned Plaintiff from the night shift to the first shift starting at 9:00 a.m.

29.     From approximately March 8, 2018 through April 19, 2018 Plaintiff was assigned the first shift starting at 9:00 a.m.

30.     On or about April 30, 2018, Defendant unilaterally and without regard to Plaintiff's disability and medical conditions, changed Plaintiff's shift to the 11:00 a.m. extended shift.  By doing so, Defendant failed to participate in the ADA interactive process in good faith.

31.     Defendant expressly prohibited Plaintiff from "clocking in" until 11:00, that is, the extended shift.

32.     In May, 2018, Defendant commenced a pattern of discriminatory conduct by willfully and deliberately refusing to recognize Plaintiff's documented and diagnosed medical condition by ignoring Plaintiff's treating physician's instructions for Plaintiff not to work either the night shift or extended shift.  During this time period, Plaintiff routinely and on numerous occasions informed Defendant that she could not work the extended shift due to her medical conditions.

33. On several occasions, Plaintiff, on her own volition and in an effort to engage in good faith in the interactive process, personally spoke and pleaded to Defendant's human resources personnel in an effort to discuss a reasonable accommodation of the work shift. Plaintiff was brought to a state of distraught crying during her meetings with human resources. Defendant's human resources personnel ignored Plaintiff's requests for assistance or reasonable accommodation and, even more egregious, <u>Plaintiff was then subjected to verbal taunting by her supervisor that if she did not like the extended shift, she could quit by "turn[ing] in her badge.</u>" The supervisor's taunting was intentional and willful, designed to create anxiety, stress and force Plaintiff to pick between her physical and mental health and well-being and her job. Defendant's actions show a deliberate, reckless and willful indifference to Plaintiff and her medical conditions, as well as Defendant's obligations (and Plaintiff's rights) under the ADA. Such deliberate, reckless and willful indifference is further exacerbated by the fact that Defendant continued to allow some employees (none of which were disabled or otherwise had serious health conditions) to select to voluntarily remain on the first shift.

34. Plaintiff continued to report to work at 9:00 a.m. as she needed to leave at approximately 5:30 p.m. to stay on her care plan and avoid jeopardizing her health. Defendant refused to permit Plaintiff to clock in at 9:00 a.m.

35. During this time period, not only did Defendant ignore Plaintiff's physician's instructions and numerous requests for reasonable accommodations, but also continued verbally taunting and harassing Plaintiff by telling her that if she did not like the extended shift, she could quit by "turn[ing] in her badge."

36. Beginning in or about May of 2018, Defendant began to discipline Plaintiff for "unexcused absences" because she would stop working at approximately 5:30 p.m. in order to maintain her established medical condition care routine.

37. Plaintiff was terminated on or about June 21, 2019 for violating Defendant's attendance policy. The violations underlying Plaintiff's termination was Plaintiff's clocking out at 5:30 p.m.

38. Throughout the course of Plaintiff's employment with Defendant, including the weeks immediately preceding her termination, Defendant utilized a point system attendance policy to discipline Plaintiff, without any regard for her disability. After Defendant's switching of Plaintiff to the extended shift, Plaintiff continued to present herself at work for the first shift, at which time, Defendant prohibited Plaintiff from starting work until the extended shift commenced at 11:00 a.m. She then would clock out at her the regular shift end time (i.e. 5:30 p.m.), at which time, the Defendant would utilize the point system against her by indicating she left work early without permission. Defendant then utilized the accumulation of adverse points as the pretext to fire Plaintiff for violating the attendance policy.

### -COUNT I-
### (VIOLATION OF THE AMERICAN WITH DISABILITIES ACT)

39. Plaintiff re-alleges and reincorporate paragraphs 1 through 38 as though fully set forth herein.

40. This is a claim for violation of the American with Disabilities Act, as amended (the "ADA"), 42 U.S.C. § 12101, *et. seq*.

41. Defendant is a covered "employer" within the meaning of the ADA. *See* 42 U.S.C. § 12111(5).

42.     At all relevant times, Plaintiff is and was a "qualified individual" with a disability and in a protected group under the ADA.  *See* 42 U.S.C. § 12111(8).

43.     Under §12112 of the ADA, it is unlawful for Defendant to discriminate against a qualified individual such as Plaintiff on the basis of disability in regard to her advancement, discharge, compensation, training, and other terms, conditions, and privileges of employment.

44.     Defendant's failure to permit Plaintiff to work the first shift constitutes the not making of a reasonable accommodation to the known physical and mental limitations of Plaintiff. This is particularly true given Defendant permitted some of Plaintiff's departmental, non-disabled peers the option to remain on the first shift.

45.     In violation of the ADA, Defendant unlawfully denied Plaintiff a reasonable accommodation for her disability.

46.     As alleged above, Plaintiff attempted to engage Defendant in an interactive process to obtain a reasonable accommodation under the ADA.  However, Defendant failed to participate in the interactive process in good faith and, to the contrary, commenced verbally taunting Plaintiff.

47.     In violation of § 12112 of the ADA, Defendant unlawfully discriminated against Plaintiff.

48.     Defendant treated Plaintiff differently than those outside Plaintiff's protected class.

49.     The unlawful employment practices, complained of herein, were done despite Plaintiff's qualifications for the job.

50.     Defendant has conducted itself intentionally, deliberately, willfully, and in callous disregard of the rights of Plaintiff under the ADA thereby subjecting Defendant to punitive damages.

51.     As a result of the foregoing, Plaintiff suffered damages.

52. Plaintiff is entitled to an award of her reasonable attorneys' fees, including litigation expenses, and costs pursuant to 42 U.S.C. § 12205.

53. Plaintiff is entitled to the statutory remedies set forth in 42 U.S.C. § 12117(a).

WHEREFORE, Plaintiff, Stesie Edouard, demands judgment against Defendant, for damages, including lost pay, compensatory and punitive, together with any and all equitable relief this Court deems just and proper, including reasonable attorneys' fees, together with an award of interest and costs as allowable by the ADA.

## -COUNT II-
## (RETALIATION)

Plaintiff sues Defendant and alleges as follows:

54. Plaintiff re-alleges and reincorporates paragraphs 1 through 38 as though fully set forth herein.

55. This is an action for retaliation brought by Plaintiff and against Defendant under the ADA, to-wit, 42. U.S.C. § 12203.

56. Plaintiff engaged in protected activity by seeking a reasonable accommodation under the ADA.

57. By terminating Plaintiff, Defendant took adverse employment action against Plaintiff.

58. There was a causal connection between Plaintiff's protected activity and the adverse employment action against Plaintiff.

WHEREFORE, Plaintiff, Stesie Edouard, demands judgment against Defendant, for damages, including lost pay, compensatory and punitive, together with any and all equitable relief this Court deems just and proper, including reasonable attorney's fees, together with an award of interest and costs as allowable by the ADA.

## -COUNT III-
## (UNLAWFUL EMPLOYMENT PRACTICES UNDER § 760.10, FLORIDA STATUTES)

59. Plaintiff re-alleges and reincorporates paragraphs 1 through 3 and 5 through 38 as though fully set forth herein.

60. Count IV is a state law claim or damages brought pursuant to the Florida Civil Rights Act of 1997, Fla. Stat. § 760.01, *et. seq*. (the "FLCRA").

61. Section 760.10(1), Florida Statutes, reads in applicable part: "[i]t is an unlawful employment practice for an employer:  (a) To discharge or to fail or refuse to hire any individual, or otherwise to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's …. handicap…"

62. At all times material hereto, Defendant engaged in unlawful employment practices in violation of Fla. Stat. § 760.10 by failing to provide Plaintiff with a reasonable accommodation and then terminating her in retaliation. ..

63. By subjecting Plaintiff to discriminatory employment practices, Defendant acted with intent, malice and with reckless disregard for Plaintiff' protected rights under state and federal law.

64. The unlawful employment practices, complained of herein, were done despite Plaintiff' qualifications for the job.

65. Defendant treated Plaintiff differently than those outside Plaintiff' protected classes.

66. As a direct and proximate cause of Defendant's intentional conduct, Plaintiff suffered serious economic losses as well as mental pain and suffering.

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Order Defendant to make whole Plaintiff, who was wrongfully discharged or terminated, by providing appropriate lost wages and back pay, with prejudgment and post-judgment interest, in amounts to be determined at trial, and other affirmative relief necessary to eradicate the effects of these unlawful employment practices including, but not limited to, reinstatement or front pay in lieu thereof;

B. Order Defendant to make whole Plaintiff, who was wrongly discharged or terminated, by providing compensation for past and future pecuniary losses resulting from the unlawful employment practices described in this action including, but not limited to, relocation expenses, job search expenses, medical expenses, penalties for defaulting on loans, moving expenses and the like, in amounts to be determined at trial;

C. Order Defendant to make whole Plaintiff, who was wrongly discharged or terminated, by providing compensation for past and future nonpecuniary losses resulting from the unlawful practices complained of in this action including, but not limited to, emotional and/or physical pain, suffering and mental anguish, humiliation, and loss of enjoyment of life, and the like, in amounts to be determined at trial;

D. Order Defendant to cancel and expunge all unwarranted personnel action and any adverse materials relating to the Defendant's discriminatory practices;

E. Order Defendant to pay Plaintiff, who was wrongly discharged or terminated, punitive damages for Defendant's malicious and reckless conduct, as described in this action, in amounts to be determined at trial;

F. Award Plaintiff any relief allowable pursuant to Fla. Stat. § 760.11(5);

G. Award Plaintiff their attorneys' fees and costs of this action pursuant to Fla. Stat. § 760.11(5); and

H.	Grant such further relief as the Court deems necessary and proper in the public interest.

## DEMAND FOR JURY TRIAL

Plaintiff respectfully requests a trial by jury on all issues so triable.

Respectfully submitted,

THE ALDERMAN LAW FIRM
*Attorneys for Plaintiff*
9999 NE 2nd Avenue, Suite 211
Miami Shores, Florida 33138
Telephone: 305-200-5473
Facsimile: 305-200-5474
E-Mail: jalderman@thealdermanlawfirm.com
kjohnson@thealdermanlawfirm.com

By: */s/ Jason R. Alderman*
Jason R. Alderman
Florida Bar No. 172375
Kristy M. Johnson
Florida Bar No. 144282
Troy A. Tolentino
Florida Bar No. 117981